**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT BERG, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | |
| ) | Case No. _____ |
| v. ) ) | |
| ) | JURY TRIAL DEMANDED |
| KCG HOLDINGS, INC., CHARLES ) HALDEMAN, DEBRA CHRAPATY, ) | CLASS ACTION |
| DANIEL COLEMAN, PETER R. FISHER, ) RENE M. KERN, JAMES T. MILDE, JOHN ) C. MORRIS, ALASTAIR RAMPELL, ) DANIEL F. SCHMITT, LAURIE M. ) SHAHON, COLIN SMITH, HEATHER E. ) TOOKES, ADRIAN WELLER, VIRTU ) FINANCIAL, INC, and ORCHESTRA ) MERGER SUB, INC., ) ) | |
| Defendants. ) | |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on April 20, 2017 (the "Proposed Transaction"), pursuant to which KCG Holdings, Inc., ("KCG" or the "Company") will be acquired by Virtu Financial, Inc. ("Parent") and Orchestra Merger Sub, Inc. ("Merger Sub," and together with Parent, "Virtu").

2. On April 20, 2017, KCG's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Virtu. Pursuant to the terms of the Merger Agreement, stockholders of KCG

will receive $20.00 per share in cash.

3. On May 11, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of KCG common stock.

9. Defendant KCG is a Delaware company and maintains its headquarters at 300 Vesey Street, New York, New York 10282. KCG's common stock is traded on the NYSE under

2

the ticker symbol "KCG."

10. Defendant Charles Haldeman ("Haldeman") is a director of KCG and is Chairman of the Board.

11. Defendant Debra Chrapaty ("Chrapaty") is a director of KCG. According to the Company's website, Chrapaty is a member of the Risk and Technology Committee.

12. Defendant Daniel Coleman ("Coleman") is a director of KCG and the Chief Executive Officer ("CEO") of the Company.

13. Defendant Peter R. Fisher ("Fisher") is a director of KCG.

14. Defendant Rene M. Kern ("Kern") is a director of KCG. According to the Company's website, Kern is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

15. Defendant James M. Milde ("Milde") is a director of KCG. According to the Company's website, Milde is Chairman of the Compensation Committee and the Risk and Technology Committee.

16. Defendant John C. Morris ("Morris") is a director of KCG. According to the Company's website, Morris is Chairman of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

17. Defendant Alastair Rampell ("Rampell") is a director of KCG. According to the Company's website, Rampell is a member of the Finance and Audit Committee and the Risk and Technology Committee.

18. Defendant Daniel F. Schmitt ("Schmitt") is a director of KCG. According to the Company's website, Schmitt is Chairman of the Finance and Audit Committee.

19. Defendant Laurie M. Shahon ("Shahon") is a director of KCG. According to the

3

Company's website, Shahon is a member of the Finance and Audit Committee and the Nominating and Corporate Governance Committee.

20. Defendant Colin Smith ("Smith") is a director of KCG.

21. Defendant Heather E. Tookes ("Tookes") is a director of KCG.

22. Defendant Adrian Weller ("Weller") is a director of KCG.

23. The defendants identified in paragraphs 10 through 22 are collectively referred to herein as the "Individual Defendants."

24. Defendant Parent is Delaware corporation and a party to the Merger Agreement.

25. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of KCG (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

27. This action is properly maintainable as a class action.

28. The Class is so numerous that joinder of all members is impracticable. As of April 17, 2017, there were approximately 66,680,421 shares of KCG Class A common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

29. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

30. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

31. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

32. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company and the Proposed Transaction*

33. KCG offers leading services designed to address trading needs across asset classes, product types, and time zones.

34. As one of the world's largest independent market makers, the Company combines advanced technology with client service to deliver unique liquidity, lower transaction costs, and improve pricing.

35. KCG serves clients and operates in the markets through three primary businesses: Market Making, Global Execution Services, and Venues.

36.     In Market Making, electronic trading combined with experienced traders allow KCG to provide among the highest retail order execution quality in the industry for its broker-dealer clients. In addition to market making on behalf of clients, the Company plays a vital role in the market structure by continually buying and selling in global equities, fixed income, foreign exchange, and commodities.

37.     Through the Company's Global Execution Services, institutions have access to sophisticated algorithms and experienced trading desks to access deep liquidity, maintain anonymity, and minimize market impact.

38.     KCG's execution Venues are leading electronic trading marketplaces with a combination of liquidity and functionality otherwise unavailable.

39.     The Company employs a team of approximately 1,100 employees with trading experience throughout the Americas, Europe, and Asia Pacific.

40.     On January 19, 2017, KCG issued a press release wherein it reported its financial results for the fourth quarter of 2016. The Company reported that total revenues were $580.5 million, compared to $208.5 million in the third quarter of 2016 and $264 million in the fourth quarter of 2015. Pre-tax earnings were $309.87 million, compared to a loss of $27.97 million in the third quarter of 2016 and a loss of $4.47 million in the fourth quarter of 2015. Earnings per share were $2.47 compared to ($0.13) in the third quarter of 2016 and ($0.03) in the fourth quarter of 2015. For its Market Making segment, the Company reported that total revenues were $168.3 million, compared to $136.1 million in the third quarter of 2016 and $168.2 million in the fourth quarter of 2015. For the Global Execution Services segment, the Company reported that total revenues were $75.5 million, compared to $63.7 million in the third quarter of 2016 and $70.2 million in the fourth quarter of 2015. For the Corporate and Other segment, the Company

reported that total revenues were $336.7 million, compared to $8.7 million in the third quarter of 2016 and $25.6 million in the fourth quarter of 2015. With respect to the results, Individual Defendant Coleman stated that "KCG's long-term growth is aligned with profound, secular changes in technology, regulation and competition. We are concentrating on attaining scale to enable us to grow without creating significant costs."

41. Nevertheless, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

42. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 7.4(a) of the Merger Agreement states:

> (a) Except as otherwise contemplated by this Section 7.4, the Company shall not, and shall use reasonable best efforts to cause its Affiliates or any of its or their respective officers, directors or employees, agents, affiliates and representatives (including any investment bankers, attorneys or accountants retained by it or any of its Affiliates) (collectively, "Representatives") not to, directly or indirectly, (i) solicit or initiate, or knowingly encourage, induce or facilitate (including by way of providing information) any Company Takeover Proposal or any inquiry or proposal that constitutes or may reasonably be expected to result in a Company Takeover Proposal, (ii) participate in any discussions or negotiations with any Person regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not a Person making a Company Takeover Proposal) with respect to any Company Takeover Proposal or any inquiry or proposal that may reasonably be expected to result in a Company Takeover Proposal, (iii) approve or recommend, or propose to approve or recommend, any Company Takeover Proposal, (iv) approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, memorandum of understanding, merger agreement, asset or share purchase or share exchange agreement, option agreement or other similar

7

agreement related to any Company Takeover Proposal (an "Acquisition Agreement"), (v) enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder, or (vi) propose or agree to do any of the foregoing. The Company shall, and shall cause its Representatives to, immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Company Takeover Proposal, or any inquiry or proposal that may reasonably be expected to result in a Company Takeover Proposal, request the prompt return or destruction of all confidential information previously furnished and immediately terminate all physical and electronic data room access previously granted to any such Person or its Representatives.

43. Further, the Company must promptly advise Virtu of any proposals or inquiries received from other parties. Section 7.4(f) of the Merger Agreement states:

(f) In addition to the foregoing obligations of the Company set forth in this Section 7.4, the Company shall within 24 hours of the receipt thereof, advise Parent orally of any Company Takeover Proposal, the material terms and conditions of any such Company Takeover Proposal (including any changes thereto) and the identity of the Person making any such Company Takeover Proposal. The Company shall (x) keep Parent informed in all material respects and on a reasonably current basis (and in no event later than 24 hours from the occurrence or existence of any material event, fact or circumstance) of the status and details (including any material change to the terms thereof) of any Company Takeover Proposal, and (y) provide to Parent as soon as practicable after receipt or delivery thereof copies of all correspondence and other written material exchanged between the Company or any of its Subsidiaries and any Person that describes any of the terms or conditions of any Takeover Proposal.

44. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Virtu a "matching right" with respect to any "Superior Company Proposal" made to the Company. Sections 7.4(d) and (e) of the Merger Agreement provide:

(d) Notwithstanding the foregoing provisions, the Company Board may, prior to (but not after) the adoption of this Agreement by the holders of shares of Company Class A Common Stock in accordance with Section 251 of the DGCL, make a Company Adverse Recommendation Change if (x) in response to an unsolicited bona fide written Company Takeover Proposal, the Company Board

8

determines (after consultation with its outside legal and, with regard to financial matters, its financial advisors) that such unsolicited bona fide written Company Takeover Proposal constitutes a Superior Company Proposal and following consultation with outside legal counsel, that failure to make a Company Adverse Recommendation Change is reasonably likely to violate its fiduciary duties to the stockholders of the Company under Applicable Law, or (y) other than in connection with a Company Takeover Proposal, an event, fact, circumstance, development or occurrence that affects the business, assets or operations of the Company or its Subsidiaries that is unknown to the Company Board as of the date of this Agreement becomes known to the Company Board (an "Intervening Event") prior to the adoption of this Agreement by the holders of shares of Company Class A Common Stock in accordance with Section 251 of the DGCL and the Company Board has concluded in good faith, following consultation with its outside legal counsel, that failure to make a Company Adverse Recommendation Change is reasonably likely to violate its fiduciary duties to the stockholders of the Company under Applicable Law; provided, however, that the Company shall not be entitled to exercise its right to make a Company Adverse Recommendation Change until after the fifth (5th) Business Day (the "Recommendation Change Notice Period") following Parent's receipt of written notice (a "Company Notice of Recommendation Change") from the Company advising Parent that the Company Board intends to take such action, including the details of the Intervening Event or, in the case of a Superior Company Proposal, the terms and conditions of any Superior Company Proposal that is the basis of the proposed action by the Company Board and the identity of the party making such Superior Company Proposal, and, if applicable, shall have contemporaneously provided a copy of all of the relevant proposed transaction agreements and any other documents provided by, or correspondence with, the party making such Superior Company Proposal, including the then-current form of the definitive agreements with respect to such Superior Company Proposal (it being understood and agreed that any amendment to any material term of such Superior Company Proposal or change to the material facts and circumstances relating to such Intervening Event shall require a new Company Notice of Recommendation Change and trigger a new Recommendation Change Notice Period). The Company Board may not make a Company Adverse Recommendation Change in respect of a Superior Company Proposal if any such Superior Company Proposal resulted from a breach by the Company of this Section 7.4.

(e) Notwithstanding the foregoing, in determining whether to make a Company Adverse Recommendation Change, the Company Board shall take into account any changes to the terms of this Agreement committed to in writing by Parent in response to a Company Notice of Recommendation Change or otherwise; provided, that the Company shall, and shall use its reasonable best efforts to cause its financial and legal advisors to, during the Recommendation Change Notice Period and prior to any Company Adverse Recommendation Change, negotiate with Parent in good faith (to the extent Parent also seeks to negotiate) to make

such adjustments in the terms and conditions of this Agreement so that (i) in the event of a Company Notice of Recommendation Change in respect of a Superior Company Proposal, this Agreement results in a transaction that is no less favorable to the stockholders of the Company than any Company Takeover Proposal that would be deemed to constitute a Superior Company Proposal in the absence of such adjustments or (ii) in the event of a Company Notice of Recommendation change in respect of an Intervening Event, the Company Board would no longer be required to make a Company Adverse Recommendation Change in order not to be reasonably likely to violate its fiduciary duties to the stockholders of the Company under Applicable Law, and, in the event Parent agrees to make such adjustments to the Agreement in either case of clause (i) or (ii) above, as applicable, no Company Adverse Recommendation Change shall be made.

45. Further locking up control of the Company in favor of Virtu, the Merger Agreement provides for a "termination fee" of $45 million, payable by the Company to Virtu if the Individual Defendants cause the Company to terminate the Merger Agreement.

46. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

47. Additionally, Jefferies LLC ("Jefferies"), the beneficial owner of 24.5% of the Company's Class A common stock, entered into a voting agreement with Parent and Merger Sub pursuant to which Jefferies has agreed to vote its shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

48. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

49. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

50. Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

51. The analyses performed by the Company's own financial advisor, Goldman Sachs & Co. LLC ("Goldman"), confirm the inadequacy of the merger consideration. For example, Goldman's *Illustrative Present Value of Future Share Price Analysis* yielded implied present values per share of Company common stock as high as $31.17. Goldman's *Illustrative Discounted Cash Flow Analysis* yielded implied present values per share of Company common stock as high as $27.09.

52. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

53. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

54. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

55. First, the Proxy Statement omits material information regarding KCG's financial projections and the financial analyses performed by the Company's financial advisor, Goldman, in support of its so-called fairness opinion.

56. With respect to KCG's financial projections, the Proxy Statement fails to disclose: (i) unlevered free cash flow and its constituent line items, including, but not limited to, capital expenditures and changes in net working capital; (ii) interest; (iii) taxes; (iv) depreciation and amortization; (v) stock-based compensation expense; (vi) net operating losses; and (vii) a reconciliation of all non-GAAP to GAAP metrics.

57. With respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy

Statement fails to disclose: (i) the estimates of unlevered free cash flow for the Company for the last nine months of 2017 and for the years 2018 through 2021, and the corresponding definition and constituent line items; (ii) the range of illustrative terminal values for the Company; (iii) the terminal year estimate of the free cash flow to be generated by the Company; (iv) the amount of the Company's estimated net debt as of March 31, 2017 as provided by Company management; (v) the number of fully diluted outstanding shares of the Company as provided by Company management; (vi) Goldman's basis for applying perpetuity growth rates ranging from (2.0)% to 2.0%; and (vii) the inputs underlying the discount rates ranging from 9.0% to 11.0%.

58. With respect to Goldman's *Illustrative Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose: (i) Goldman's basis for applying price to two-year forward earnings per share multiples of 8.0x to 12.0x earnings per share of Company common stock estimates for each of the fiscal years 2019 to 2021; and (ii) the inputs underlying the discount rate of 12.2%.

59. With respect to Goldman's *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Goldman.

60. With respect to Goldman's *Selected Companies Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Goldman.

61. With respect to Goldman's *Present Value of Price/Book Multiple to RoE Regression Analysis*, the Proxy Statement fails to disclose the multiples observed by Goldman.

62. With respect to Goldman's *Transaction Premia Analysis*, the Proxy Statement fails to disclose: (i) the acquisitions observed by Goldman; (ii) the transaction values for the

12

acquisitions; and (iii) the premia represented by the prices per share paid in the transactions.

63. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

64. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors"; (iii) "Unaudited Prospective Financial Information"; and (iv) "Opinion of Goldman Sachs & Co. LLC."

65. Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

66. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of KCG's officers and directors, including who participated in all such communications.

67. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

68. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors"; and (iii) "Interests of Certain Persons in the Merger."

69. Third, the Proxy Statement omits material information regarding potential conflicts of interest of Goldman.

70. The Proxy Statement fails to disclose the amount of "certain fees" Goldman is entitled to receive under its engagement with KCG if the Proposed Transaction is not consummated.

71. Additionally, the Proxy Statement provides:

> Goldman Sachs and its affiliates and employees, and funds or other entities in which they invest or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of the Company, Virtu, any of their respective affiliates and third parties, including Leucadia National Corporation, the parent of Jefferies, Temasek Holdings (Private) Limited, an affiliate of a significant shareholder of Virtu ("Temasek"), the Republic of Singapore and its agencies or instrumentalities (collectively, the "Republic of Singapore"), including the Singapore Minister for Finance, the sole shareholder of Temasek, North Island Holdings I, L.P. ("North Island"), which, together with certain of its affiliates, is providing equity financing to Virtu in connection with the merger, GIC Private Limited ("GIC"), which is providing equity financing to North Island in connection with the merger, the Public Sector Pension Investment Board ("PSP"), which is providing equity financing to North Island in connection with the merger, and any of their respective affiliates and portfolio companies, or any currency or commodity that may be involved in the merger for the accounts of Goldman Sachs and its affiliates and employees and their customers.

However, the Proxy Statement fails to disclose Goldman's holdings in Virtu, Leucadia National Corporation, Temasek, the Republic of Singapore, North Island, GIC, PSP, and their affiliates.

72. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

73. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors"; and (iii) "Opinion of Goldman Sachs & Co. LLC."

74. Fourth, the Proxy Statement omits material information regarding the background of the Proposed Transaction. The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

75. For example, the Proxy Statement fails to disclose the nature of the discussions between Virtu and Jefferies in December 2016 and early 2017 regarding Virtu's potential acquisition of KCG, including the "ranges of prices per share at which Virtua might consider making a proposal to acquire the Company."

76. The Proxy Statement fails to disclose whether the non-disclosure agreement entered into between KCG and "Party A" contained a "don't ask, don't waive" provision.

77. The Proxy Statement further fails to disclose the nature of the "inquiries concerning acquisitions of certain assets or businesses of the Company."

78. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; and (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors."

79. The above-referenced omitted information, if disclosed, would significantly alter

the total mix of information available to KCG's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and KCG

80. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

81. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. KCG is liable as the issuer of these statements.

82. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

83. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

84. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

85. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

86. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and

Rule 14a-9 promulgated thereunder.

87. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Virtu

88. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

89. The Individual Defendants and Virtu acted as controlling persons of KCG within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of KCG and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

90. Each of the Individual Defendants and Virtu was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

91. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

92.     Virtu also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

93.     By virtue of the foregoing, the Individual Defendants and Virtu violated Section 20(a) of the 1934 Act.

94.     As set forth above, the Individual Defendants and Virtu had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees; and

  F. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: May 19, 2017           **RIGRODSKY & LONG, P.A.**

                By:  */s/ Timothy J. MacFall*
                   Timothy J. MacFall
                   825 East Gate Boulevard, Suite 300
                   Garden City, NY 11530
                   (516) 683-3516

                   Brian D. Long
                   Gina M. Serra
                   2 Righter Parkway, Suite 120
                   Wilmington, DE 19803
                   (302) 295-5310

                   *Attorneys for Plaintiff*

**OF COUNSEL:**

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800